785 F.2d 1200
 Prod.Liab.Rep.(CCH)P 10,932
James Troy JOYCE, Appellant,
and
William S. Legus, Sr., James S. Moore, William S. Legus,
Sr., Executor of the will of Bessie C. Legus, Plaintiffs,
v.
A.C. AND S., INC., a/k/a Acands, Inc.; Eagle-Picher
Industries, Inc.; Owens-Corning Fiberglas Corp.;
Pittsburgh Corning Corp.; Celotex Corp.; Armstrong Cork
Co.; E.I. DuPont de Nemours & Co., Inc.; Gale Corp.; Lake
Asbestos of Quebec, Ltd.; GAF Corp.; Raymark Industries,
Inc.; Turner & Newall, PLC, Appellees,
and
Atlas Turner, Ltd.; Bell Asbestos Mines, Ltd.; Keene
Corp.; Southern Textile Corp.; Nicolet, Inc.;
Forty-Eight Insulation, Inc., Defendants.
James Troy JOYCE; William S. Legus, Sr.; James S. Moore;
William S. Legus, Sr., Executor of the will of
Bessie C. Legus, Appellants,
v.
E.I. DuPONT de NEMOURS & CO., INC., Appellee,
and
A.C. and S., Inc., a/k/a Acands, Inc.; Eagle-Picher
Industries, Inc.; Owens-Corning Fiberglas Corp.;
Pittsburgh Corning Corp.; Armstrong World Ind., Inc.; The
Celotex Corp.; Fiberboard Corp.; Armstrong Cork Co.;
Atlas Turner, Ltd.; Bell Asbestos Mines, Ltd.; Gale Corp.;
Keene Corp.; Lake Asbestos of Quebec, Ltd.; GAF Corp.;
Raymark Industries, Inc.; Southern Textile Corp.; Nicolet,
Inc.; Turner & Newall, PLC; Forty-Eight Insulation, Inc.,
Defendants.
 Nos. 84-2064, 85-1255.
 United States Court of Appeals,
Fourth Circuit.
 Argued Dec. 5, 1985.
Decided Feb. 28, 1986.
 
 Joel I. Klein (Onek, Klein & Farr on brief) and Thomas Crumplar (Robert Jacobs; Jacobs & Crumplar, P.A.; Fred D. Smith, Jr.; Hartley & Smith, P.C. on brief), for appellants.
 John Y. Pearson, Jr. (Willcox, Savage, Dickson, Hollis & Eley on brief) and Lewis T. Booker (Virginia W. Powell; Hunton & Williams on brief), for appellee.
 Before PHILLIPS and SNEEDEN, Circuit Judges, and SWYGERT, Senior United States Circuit Judge, sitting by designation.
 JAMES DICKSON PHILLIPS, Circuit Judge:
 
 
 1
 James Troy Joyce appeals the dismissal of his claims against various miners and manufacturers of asbestos products[1] (manufacturers), and against E.I. DuPont de Nemours & Co. (DuPont), his former employer, for damages allegedly resulting from his occupational exposure to asbestos insulation over a period of several years. The district court, 591 F.Supp. 449 (W.D.Va.1984), held that Joyce's claims against the manufacturers were barred by Virginia's two-year statute of limitations on actions for personal injuries, and dismissed all but one of his claims against DuPont pursuant to the exclusivity provision of the Virginia Workers' Compensation Act. After permitting limited discovery, the district court granted summary judgment for DuPont in connection with Joyce's remaining claim, for alleged fraudulent concealment of his medical condition. Finding no error in any of the rulings by the district court, we affirm.
 
 
 2
 * The facts are not in dispute. James Troy Joyce[2] was employed by DuPont, in its Martinsville, Virginia, plant, for four months in 1946 and later continuously from 1951 through March 1982, when he retired due to ill health. Joyce was exposed to asbestos while working as an insulator for approximately eleven years, from 1952 to 1955 and again from 1964 to 1972. In 1972, after learning from newspaper articles of the potential hazards of asbestos, Joyce obtained a job transfer in order to avoid further exposure to asbestos insulation.
 
 
 3
 Joyce nevertheless suffered pleural thickening in one lung at least as early as 1970.[3] This condition, revealed by chest X-rays taken in connection with annual physical examinations, was asymptomatic and remained relatively unchanged until 1981. In his deposition testimony, Dr. James Layton, Medical Director at DuPont's Martinsville plant, claimed that during this period he was unaware of any connection between the pleural thickening and asbestosis.
 
 
 4
 In 1979, DuPont adopted a company-wide policy of sending to outside radiologists the X-rays of all employees who had been exposed to asbestos. An independent radiologist thus reviewed Joyce's 1980 X-rays and concluded that there had been no change over the preceding decade. In addition to chest X-rays, DuPont also began to administer pulmonary function tests to asbestos workers. Joyce's 1980 pulmonary function test was normal.
 
 
 5
 In January 1981, citing a "heightened sensitivity" to a possible link between pleural thickening and asbestos exposure, Dr. Layton sent a group of employees, including Joyce, to Dr. William P. O'Neill, a pulmonary specialist. Dr. O'Neill determined that, although his pulmonary function remained normal, Joyce had mild pleural asbestosis manifested by pleural thickening in both lungs. Joyce was informed of this diagnosis, obtained other opinions, and eventually underwent surgery for his lung disorder.
 
 
 6
 Joyce has since developed pleural effusion and parenchymal asbestosis. Joyce, a citizen of Virginia, filed this action, invoking the district court's diversity jurisdiction, on January 10, 1983. He sought damages relating to pleural effusion and parenchymal asbestosis[4] and alleged, with respect to the manufacturers, negligent failure to warn, fraudulent misrepresentation or concealment, conspiracy, strict liability, and malicious or reckless disregard for his rights.
 
 
 7
 According to medical evidence in the record, Joyce developed pleural effusion sometime between January 13 and July 1981, but showed no signs of parenchymal asbestosis until sometime after his final visit with Dr. O'Neill, on September 2, 1981. Thus, both of these diseases, which, for purposes of their motion for summary judgment, the manufacturers agreed to characterize as separate and distinct illnesses, rather than progressive stages of the initial pleural thickening, developed within two years of the filing of Joyce's complaint.
 
 
 8
 The district court nevertheless held that Virginia's two-year statute of limitations had been triggered by the onset, many years earlier, of Joyce's first asbestos-related disease, pleural thickening, and that his action for damages in connection with the later diseases was therefore untimely. The manufacturers' motion for summary judgment was granted on this basis, and the claims against them dismissed.
 
 
 9
 Joyce's claims against his employer, DuPont, took two forms. First, he claimed that DuPont intentionally failed to warn of the inherent dangers of asbestos and failed to take steps to alleviate exposure to asbestos products, seeking damages for his pleural effusion and parenchymal asbestosis. The district court granted DuPont's motion to dismiss on the ground that Virginia's Workers' Compensation Act provides the exclusive remedy for the injuries alleged.
 
 
 10
 Joyce separately urged that DuPont had fraudulently concealed his medical condition during the limitations period, depriving him of a valuable property right--his cause of action against the manufacturers, should they prevail on their statute of limitations defense. The district court denied DuPont's motion to dismiss and permitted discovery on the issue of concealment, but later granted summary judgment in DuPont's favor on the basis that Joyce had failed to raise a genuine issue of material fact with respect to the alleged fraudulent concealment and that DuPont was entitled to judgment as a matter of law.
 
 
 11
 In this appeal, Joyce challenges the adverse disposition of each of his claims, which we now examine in turn.
 
 II
 The Manufacturers
 
 12
 Because jurisdiction in this case is based upon diversity, we must look to Virginia law to determine both the applicable statute of limitations and the time at which these claims accrued thereunder. See Ragan v. Merchants Transfer and Warehouse Co., 337 U.S. 530, 69 S.Ct. 1233, 93 L.Ed. 1520 (1949). The parties agree that Virginia's two-year statute of limitations for personal injury claims applies in this case. Va.Code Sec. 8.01-243(A) (1984). The only issue on appeal is thus whether these claims accrued when the pleural effusions and parenchymal asbestosis diseases first appeared, within the limitations period, or when Joyce developed pleural thickening more than ten years earlier. Although this precise issue has not been addressed by the Supreme Court of Virginia, we are constrained to hold that, given that court's prior decisions and adherence to the theory that in an action for personal injury, there is but a single, indivisible cause of action, Joyce's only cause of action against the manufacturers accrued when he first developed pleural thickening sometime prior to 1970.
 
 
 13
 The Virginia statute of limitations for personal injuries provides, in pertinent part, that "every action for personal injuries, whatever the theory of recovery, ... shall be brought within two years next after the cause of action shall have accrued." Va.Code Sec. 8.01-243(A) (1984). Accrual is governed by Va.Code Sec. 8.01-230 (1984), which provides that "[i]n every action for which a limitation period is prescribed, the cause of action shall be deemed to accrue and the prescribed limitation period shall begin to run from the date the injury is sustained...." The issue of accrual of a cause of action for latent asbestos-related disease was addressed by the Virginia Supreme Court for the first time in Locke v. Johns-Manville Corp., 221 Va. 951, 275 S.E.2d 900 (1981).
 
 
 14
 In Locke, the plaintiff sought damages for malignant mesothelioma suffered as a result of occupational exposure to airborne asbestos fibers between 1948 and 1972. Locke was apparently in excellent health until he experienced symptoms in 1978, and a subsequent chest X-ray revealed mesothelioma. The trial court held that Locke's complaint, filed in 1978, was untimely because his exposure to asbestos had ended nearly six years earlier. The issue on appeal was whether the cause of action accrued at or before the last tortious exposure in 1972 or at the time that Locke first developed mesothelioma several years later.
 
 
 15
 Defining "injury" (for purposes of Sec. 8.01-230, the date on which a cause of action accrues) to mean "positive, physical or mental hurt to the claimant, not legal wrong to him in the broad sense that his legally protected interests have been invaded," the court held that Locke's action was timely. 275 S.E.2d at 904-05. Stressing that it was not embracing a "discovery" rule, the court noted that it is conceivable that in a given case the evidence will demonstrate that an injury occurred months or even years before the onset of symptoms and diagnosis. Id. at 905. Rather, observing that a cause of action involves three essential elements, (1) a legal obligation of a defendant to a plaintiff, (2) a violation or breach of that duty or right, and (3) harm or damage to the plaintiff caused by the violation or breach, the court held that a cause of action for personal injuries is keyed to the date of injury rather than the date of the wrongful act.[5] Id. at 904. To hold otherwise, reasoned the court, would "result in the inequity of barring the mesothelioma plaintiff's cause of action before he sustains injury." Id. at 906.
 
 
 16
 The Locke court had no occasion to consider the further wrinkle presented by this case, i.e., assuming that the statute begins to run on the date of injury, whether it begins to run anew for each successive injury caused by the same wrongful act. Joyce argues that under Locke, a personal injury plaintiff has a separate cause of action and a separate two-year limitations window for each distinct injury caused by the plaintiff's wrongful conduct, here exposure to asbestos. We disagree.
 
 
 17
 Virginia courts have long applied the rule that, for purposes of the statute of limitations, there is but a single, indivisible cause of action for all injuries sustained,[6] whether or not all of the damage is immediately apparent. A common articulation of the rule states that
 
 
 18
 where an injury, though slight, is sustained in consequence of the wrongful or negligent act of another and the law affords a remedy therefor the statute of limitations attaches at once. It is not material that all of the damages resulting from the act should have been sustained at that time and the running of the statute is not postponed by the fact that the actual or substantial damages do not occur until a later date.
 
 
 19
 Caudill v. Wise Rambler, Inc., 210 Va. 11, 168 S.E.2d 257 (1969), citing Richmond Redevelopment and Housing Authority v. Laburnum Construction Corp., 195 Va. 827, 80 S.E.2d 574 (1954). See also Louisville and Nashville Railroad v. Saltzer, 151 Va. 165, 144 S.E. 456, 457 (1928) ("Whenever any injury, however slight it may be, is complete at the time the [act or omission] is completed, the cause of action then accrues.").
 
 
 20
 Nothing in the Locke opinion suggests that the Supreme Court of Virginia intended to depart from the indivisible cause of action theory. Rather, the court stressed that "[t]he rule we adopt today is but an application of our prior decisions ... to the facts of the present case." Locke, 275 S.E.2d at 906.
 
 
 21
 In a recent case, this court, applying Virginia law, held that Locke did not afford a personal injury plaintiff separate causes of action for distinct injuries caused by the same tortious conduct by the defendant. In Brown v. American Broadcasting Co., Inc., 704 F.2d 1296 (4th Cir.1983), the plaintiff sued for defamation and emotional distress caused by an allegedly defamatory television program broadcast in 1978. The plaintiff was unaware of the broadcast until 1980, and filed her complaint in 1981, more than two years after the program was aired.
 
 
 22
 This court rejected the plaintiff's argument that under Locke the statute of limitations did not accrue until 1980, when she suffered the emotional harm for which she sought relief, because "[a]ll the necessary elements of these two claims were present, if they were ever present, upon the broadcast of the allegedly false and defamatory statement about the plaintiff." 704 F.2d at 1300. The court went on to note that under Virginia law the statute of limitations does not accrue separately for each set of damages which results from a wrongful act. "Once a cause of action is complete and the statute of limitations begins to run, it runs against all damages resulting from the wrongful act, even damages which may not arise until a future date.... The emotional distress ... was only an additional injury resulting from the same wrongful act." Id. See also Large v. Bucyrus-Erie Co., 707 F.2d 94 (4th Cir.1983), affirming the district court's grant of summary judgment for defendants, 524 F.Supp. 285 (E.D.Va.1981) ("Of course, the general rule in Virginia is that the limitations period begins to run when the initial injury, even if relatively slight, is sustained, and the manifestation of more substantial injuries at a later date does not extend the limitations period." 524 F.Supp. at 289).
 
 
 23
 In this case, although the date of Joyce's first injury--pleural thickening--is unclear, he does not dispute that it developed more than two years before this action was filed.[7] Under Locke, the statute of limitations was not triggered until the pleural thickening developed; under Virginia's indivisible cause of action rule, Joyce's only cause of action for all of his asbestos-related injuries also accrued on that date. Therefore, Joyce's complaint seeking damages from the manufacturers for pleural effusion and parenchymal asbestosis, both of which were allegedly caused by exposure to asbestos, was not timely filed and was properly dismissed by the district court.
 
 
 24
 We recognize that this rule may effectively preclude recovery for serious injuries that develop more than two years after an initial hurt, however slight, given the difficulty of proving future damages when the fact and extent of future injury is unknown. Although the indivisible cause of action theory is readily justified in cases of traumatic injury, where all damages are generally immediately apparent, its result may be harsh when applied to asbestos-related or other "creeping disease" cases where, by definition, there may be gaps between the onset of various distinct injuries caused by exposure to asbestos. We are not, of course, at liberty to modify the rule. Any change in favor of asbestos or other latent disease plaintiffs must come from the Supreme Court of Virginia or the General Assembly of that state.
 
 III
 DuPont
 
 25
 (A) Intentional failure to warn of or alleviate the danger
 
 
 26
 of asbestos exposure.
 
 
 27
 In the first of two claims against DuPont, Joyce sought damages for his pleural effusion and parenchymal asbestosis on the ground that his injuries were caused by DuPont's failure to warn of or remove the hazards of asbestos.[8] The district court granted DuPont's motion to dismiss pursuant to the Virginia Workers' Compensation Act's exclusivity clause, which provides, in pertinent part, that "[t]he rights and remedies herein granted to an employee when he and his employer have accepted the provisions of this Act ... shall exclude all other rights and remedies of such employee...." Va.Code Sec. 65.1-40 (1980).
 
 
 28
 Joyce argues that the district court erred by failing to take proper account of the fact that he alleged an intentional tort. He claims that intentional torts are outside the scope of the Virginia Act,[9] Va.Code Secs. 65.1 et seq. (1980 & Supp.1985), and are therefore unaffected by its exclusivity provision.
 
 
 29
 The basis of an intentional tort exception to workers' compensation exclusivity rules, recognized in many states, is the statutory language, also widely employed, in which application of an Act is limited to "injury by accident."[10] The Supreme Court of Virginia has not yet addressed the question whether an employer's intentional tort gives rise to a cause of action outside of the Act.[11] In Virginia, however, the Act also covers, in addition to injuries by accident, "occupational disease."[12] Because the occupational disease coverage is not expressly modified by a requirement that the disease be accidentally produced, Joyce's remedy against DuPont for even an intentional tort would appear to be exclusively within the Act.
 
 
 30
 Joyce nevertheless urges that, if confronted with the issue, the Supreme Court of Virginia would recognize an intentional tort exception to coverage of injuries by accident and would extend that exception to occupational diseases caused by intentional employer misconduct. Even assuming that occupational disease coverage is so construed, however, the conduct alleged would be insufficient to invoke the exception, as applied in those jurisdictions which recognize an exception for intentional torts.
 
 
 31
 The Virginia Workers' Compensation Act was modeled after the analogous statute in Indiana. Virginia courts have therefore considered decisions interpreting the Indiana Act[13] in construing the substantially similar statute in Virginia. Barksdale v. H.O. Engen, Inc., 218 Va. 496, 237 S.E.2d 794, 796 (1977). Indiana has adopted the majority rule limiting the intentional tort exception to conduct by an employer intended to injure the employee. Intentional acts which merely cause, but are not designed to produce, an injury, are within the coverage of the Act. In Cunningham v. Aluminum Company of America, Inc., 417 N.E.2d 1186 (Ind.App.1981), an Indiana court held that " 'the mere knowledge and appreciation of a risk, short of substantial certainty, is not the equivalent of intent.' " Id. at 1190, quoting Prosser, Law of Torts, 4th Ed. 1971, 32. See also Blade v. Anaconda Aluminum Co., 452 N.E.2d 1036, 1038 (Ind.App.1983) (allegation that employer had intentionally jeopardized the safety of employees was insufficient to take claim out of the Act because plaintiff failed to allege facts supporting her assertion that the employer created unsafe working conditions toward the end that the decedent be injured); Larson's Workmen's Compensation Law, Sec. 68.13 (1983) ("the common-law liability of the employer cannot, under the almost unanimous rule, be stretched to include accidental injuries caused by the gross, wanton, wilful, deliberate, intentional, reckless, culpable, or malicious negligence, breach of statute, or other misconduct of the employer short of genuine intentional injury." More specifically, even conduct that includes such elements as "knowingly permitting a hazardous work condition to exist, knowingly ordering claimant to perform an extremely dangerous job, ... or even wilfully and unlawfully violating a safety statute, ... still falls short of the kind of actual intention to injure that robs the injury of accidental character.")
 
 
 32
 In this case, Joyce alleged that DuPont knowingly exposed him to asbestos, but not that this exposure was designed to cause asbestos-related diseases. Thus, even under the Indiana rule, which would likely be followed by the Supreme Court of Virginia in the event it decides to adopt an intentional tort exception to its Workers' Compensation Act, Joyce's complaint fails to allege the sort of intentional conduct by DuPont that would remove his claim from the ambit of the Act.
 
 
 33
 (B) Fraudulent concealment of plaintiff's medical condition.
 
 
 34
 Joyce alleged, in the alternative, that DuPont fraudulently concealed from him his medical condition--pleural thickening--during the limitations period and thereby deprived him of his cause of action against the manufacturers, which the district court held, and which we agree, was not timely filed. The district court denied DuPont's motion to dismiss this claim,[14] and provided Joyce an opportunity to engage in discovery on the issue of concealment. Following discovery, the district court granted DuPont's motion for summary judgment,[15] determining that Joyce had failed to raise a genuine issue of material fact with respect to his claim of fraudulent concealment.[16] We agree and affirm the judgment of the district court.
 
 
 35
 The record on summary judgment is devoid of any forecast of evidence that DuPont intended to conceal from Joyce the existence of an actionable injury. Dr. Layton, the Martinsville plant's medical director, testified that he believed, until 1980,[17] that the unilateral pleural thickening he had observed in Joyce's X-rays, relatively unchanged since 1970, was not asbestos-related. Once he became sensitive to the possible link between pleural thickening and asbestos exposure, Dr. Layton sent Joyce to a pulmonary specialist, who first diagnosed pleural asbestosis in 1981. Layton was not otherwise alerted to Joyce's condition before this time; Joyce's pulmonary function test was normal in 1980, and an outside radiologist who had reviewed the X-rays agreed that Joyce's condition had not changed over the preceding decade.
 
 
 36
 In answer to DuPont's interrogatories seeking from Joyce all facts in support of his claim of fraudulent concealment, Joyce responded only that DuPont knew of, but failed to disclose, the dangers of asbestos in 1964. The company's possible awareness of such hazards, however, is not probative of its alleged intent to conceal Joyce's pleural thickening. We therefore agree that summary judgment for DuPont was appropriate on the summary judgment record before the district court.
 
 
 37
 AFFIRMED.
 
 
 38
 SWYGERT, Senior Circuit Judge.
 
 
 39
 I respectfully dissent. I believe that this case should be reversed and remanded to the district court for a trial on the merits. Both Judge Kiser, in his district court opinion, and the majority, in the ruling today, have referred to the "inequity" and "harshness" of the rule they believe controls this case. I do not believe that such an unacceptable result must be reached.
 
 
 40
 First of all, in granting summary judgment and then dismissing Joyce's claims against the manufacturer, the lower court erred, where a dispute of facts existed concerning the time a legal "injury" to Joyce occurred. Indeed, the facts in the record as it now exists suggest that no "harm" under Virginia law occurred to Joyce before 1981. At a minimum, this case should be remanded for further consideration on the merits.
 
 
 41
 Secondly, the district court committed reversible error in dismissing Count VI as it applied to corporate concealment after allowing only sharply limited discovery. On this basis as well, the case should be remanded for a full trial on the merits.
 
 
 42
 Finally, I do not believe we should reach out to decide unnecessarily the important state law issue of whether a statute of limitations begins to run anew for each successive injury caused by the same wrongful act for asbestos-related disease. Particularly when the result is as unjust as it is here, this court has the duty to avoid creating state law if possible and leave the task to the Virginia Supreme Court and the legislature. See Braswell v. Flintkote Mines, Ltd., 723 F.2d 527, 534 (7th Cir.1983). There is nothing in existing precedent which is controlling and which dictates the result reached today. In my view, given the recent trend exhibited in Virginia caselaw and the 1985 amendment of the state statute of limitations, the position reached by the Virginia high court will be that injuries resulting from different, discrete diseases caused by asbestos represent rights of action which mature independently and trigger statutes of limitations separately. However, that decision is better left to the future for the state court.
 
 
 43
 For all these reasons, I must dissent.
 
 
 44
 * In analyzing the onset of Joyce's "injury," we must distinguish "a cause of action" from a "right of action." As the Virginia Supreme Court has pointed out recently in First Virginia Bank-Colonial v. Baker, 225 Va. 72, 301 S.E.2d 8, 13 (1983):
 
 
 45
 [A] right of action is the right to presently enforce a cause of action--a remedial right affording redress for the infringement of a legal right belonging to some definite person; a cause of action is the operative facts which give rise to such light.
 
 
 46
 Although a cause of action and a right of action may accrue simultaneously, they do not necessarily do so. Indeed, two separate rights of action may accrue at different times. Id. A cause of action may have to ripen, mature into a right of action. Statutes of limitation do not affect the cause of action, but take away the right. Thus, these statutes are designed to compel the prompt assertion of an accrued right of action, not to bar such a right before it has accrued. Id., 301 S.E. at 14.
 
 
 47
 In the absence of injury or damage to a plaintiff or his property, he has no cause of action and no right of action can accrue to him. Caudill v. Wise Rambler, 210 Va. 11, 13, 168 S.E.2d 257, 259 (1969). The rule developed in Locke v. Johns-Manville Corp., 221 Va. 951, 275 S.E.2d 900 (1981), is that the right of action accrues when the damage occurred. First Virginia Bank-Colonial, 301 S.E.2d at 14. The Locke rule liberalized the Virginia law, making it clear that the right of action for a creeping disease like asbestos-caused cancer does not automatically accrue during the period of exposure, but rather is keyed to the injury or damage to the plaintiff. The Locke court made it clear that to hold otherwise would result in the inequity of barring the asbestos-caused, mesothelioma plaintiff's cause of action before he sustains injury. Locke, 275 S.E.2d at 904-06.
 
 
 48
 The Virginia Supreme Court did not reach in Locke, or in any other case to date, the further question of whether discrete asbestos-related diseases each trigger the statute of limitations separately. However, what can be learned from the analysis employed in Locke and First Virginia Bank-Colonial is that the Virginia court is carefully distinguishing between "rights of action" and "causes of action. Each right of action only matures when damage is done. This is not in contradiction to holding that the "cause of action" itself is unitary and indivisible. In my view, this analysis would lead to characterizing the cause of action, the "operative facts which give rise to such right of action," First Virginia Bank-Colonial, 301 S.E.2d at 13, as the exposure to asbestos, and the "right of action" as the matured disease.
 
 
 49
 This analysis fits with what we know now from medical science of the progressive nature of asbestos-related diseases and the fact that one discrete disease may not sequentially follow another, or even necessarily ever appear. Such a right of action is not analogous to the situation of a traumatic accident where the injury, and a right of action occur immediately, and other related damages may appear in the future. Nor is it analogous to the situation in Brown v. American Broadcasting Co., 704 F.2d 1296, 1300 (4th Cir.1983), where if the plaintiff were defamed or her reputation damaged following a broadcast, such injury was immediate and the right of action matured.
 
 
 50
 This analysis fits with the demands of the court system in assessing damages. If plaintiffs in asbestos cases were to come before a court before each right of action had ripened into a legal injury, they could only plead "substantial probability" that they will suffer a particular disease. Such a premature appearance in court, arguing damages based only on statistics, would conflict with the traditional American rule that recovery for speculative or conjectural future consequences is not permitted and present untenable difficulties for judges and juries.
 
 
 51
 The burden to prove the facts necessary to trigger an application of the statute of limitations is upon a defendant. Louisville & Nashville RR v. Saltzer, 151 Va. 165, 168, 144 S.E. 456, 457 (1928). The "time plaintiff was hurt" is to be established from available competent evidence, produced by the plaintiff or defendant, that "pinpoints the precise date of injury with a reasonable degree of medical certainty." Id. at 905. The Locke rule looks to "expert medical testimony" to demonstrate the "legally injurious" harm. Id. The Virginia courts construe the statutory word "injury" to mean "positive, physical or mental hurt" to the plaintiff. Id. at 904. The type of expert medical evidence looked toward is based on clinical, or x-ray evaluations, or impairment.
 
 
 52
 Thus, when the Virginia Code provides that "[i]n every action for which a limitation period is prescribed, the cause of action shall be deemed to accrue and the prescribed limitation period shall begin to run from the date the injury is sustained. ..." Va.Code Sec. 8.01-230 (1984), the Virginia courts interpret "injury" as a positive hurt, established by competent evidence, pinpointing the precise degree of injury with a reasonable degree of medical certainty. But the facts of this case do not appear to present such evidence. In my view, a dispute of facts exists as to whether Joyce suffered any legal injury that was not within the statute of limitations.
 
 
 53
 To begin, Joyce testified that he had no symptoms or loss of function because of pleural thickening, the condition at issue before 1981. This testimony is corroborated by the depositions of all medical witnesses in the court record on appeal.[1]
 
 
 54
 Joyce was asymptomatic at the time of and after his visit to Dr. O'Neill in January 1981; Joyce had no shortness of breath before 1980. Joyce, Dep. 145. Indeed, Dr. O'Neill believed that as late as August 1981 Joyce could work full-time and maintain full activity. Layton Dep. 158. In supporting DuPont's argument that Joyce had no symptoms of any kind which anyone at DuPont associated with an asbestos-related disease prior to 1981, Dr. Layton testified that there was no abnormality in Joyce's pulmonary functions in 1980, and that if he had been tested prior to that time those readings would also have been normal. Layton Dep. 85, 162. Joyce testified that none of his doctors had ever told him when his asbestos-related condition began, and Dr. O'Neill could not speculate on such a time when he was questioned.
 
 
 55
 DuPont did not make a proper industrial accident report for Joyce of any discernible illness before January 13, 1981. Dr. Layton confirmed that the report of a suspected occupational illness filed by the company with the Industrial Commission, and signed by Safety Supervisor O.P. Fitzgerald, listed the date of injury as "September 14, 1981." Jt.App. 86-87. Plaintiffs allege that Virginia law only provides compensation for parenchymal asbestosis and does not provide for compensation for injuries to the pleural lining of the lungs, citing application of Va.Code Sec. 65.1-56(20). Jt.App.Supp. 61. The "Memorandum of Agreement as to Payment of Compensation" signed by Joyce in settlement with the company and filed by DuPont, states that under Virginia Workmen's Compensation law for the scarring and damages to the pleural lining of his lungs:
 
 
 56
 Nature of Injuries-Diagnostic work on a suspected occupational illness and asbestos related abnormalities. At the conclusion of the diagnostic procedures, the employee was found to have no stageable occupational disease. (emphasis added)
 
 
 57
 In the absence, then, of competent medical or clinical evidence of symptoms or impairment, the only evidence which was presented, that could conceivably show that Joyce suffered a legally cognizable "injury" before 1981, were x-rays taken of his lungs dating from 1970 to 1980. Certainly, x-rays showing an abnormality may be exactly the type of evidence that can prove the existence of an injury triggering the statute of limitations. Locke, 275 S.E.2d at 905. But the x-rays presented in this case appear not to satisfy the requirements of proof "to a reasonable degree of medical certainity" as set forth in Locke.
 
 
 58
 The x-rays in the instant matter date back to 1970. Before 1970 the company policy was to discard a previous year's x-ray and retain the most recent x-ray, if there was no apparent change. Jt.App. 76. Both Dr. Layton and Dr. O'Neill, questioned about this series of films, could provide no firsthand or conclusive information.[2] Both doctors had great difficulty during their depositions even definitively identifying or pinpointing the "scarring" at issue.[3] This is related to the medical fact that the softer and less dense a lesion is, the less obviously it stands out, the less white it is, Jt.App. 70.
 
 
 59
 Although the medical experts in this case were not able to give precise testimony with regard to the clinical interpretation of the 1970-1980 x-rays, they were quite certain of the fact that there were no major changes in the x-rays during that decade. Jt.App. 79, 120. They were also sure that the medical records during the period of 1970-1980 revealed nothing that anyone at DuPont would associate with asbestos-related disease so as to trigger any need to tell Joyce. Dr. O'Neill stated that the unilateral pleural thickening which he had seen before 1981 on the x-rays would not have been sufficient for him to make a diagnosis of asbestos-related pleural thickening. O'Neill Dep. 72.
 
 
 60
 Thus, the clinical testimony given in this case failed not only to "pinpoint" the precise date and time of the "harm" from pleural thickening, which cannot always be easily determined in cases such as this, but it also could not establish "to a reasonable degree of medical certainty" that a legally cognizable injury occurred at all outside the two-year period allowed by Virginia law. The medical testimony failed to provide the expert radiographic analysis necessary and failed to analyze the clinical impact--or lack of it--of any abnormalities believed to be present. Such purported expert testimony is not adequate and has left in dispute the factual question of whether a legal "harm" occurred to Joyce before 1981.
 
 
 61
 Unable to rely on convincing medical proof of impairment or pathology documentation by x-ray, we are faced with the simple assertion by the majority that the plaintiff conceded that his first injury developed more than two years before his action was filed. Ante at 1205. The district court as well relied on this argument, Memorandum Opinion, pp. 10, 12, n. 4, and both cite to the same source: Plaintiff's Memorandum in Opposition to Celotex's Motion for Summary Judgment at 3, n. 3. But the footnote merely states that according to DuPont records, Joyce "probably" had pleural thickening, but that plaintiff was not attempting to recover for his asbestos-related pleural disease from Celotex. Instead, the footnote states, a suit was brought against DuPont alleging that the company knew of the existence of Joyce's disease, but never informed him of its existence, causing Joyce to lose valuable legal rights. Jt.App. 147.
 
 
 62
 There is nothing in the footnote which decides the outcome in this case. It is simply a reference to the fact that the original complaint sought to recover for two diseases (pleural asbestosis and parenchymal asbestosis), paragraphs 28, 29, and pled in the alternative that if the court found that plaintiff determined that an injury existed prior to 1981 then it was as a result of fraud and concealment by DuPont that such knowledge was not imparted to the plaintiff, and that now time bars him, paragraphs 53, 54.
 
 
 63
 This is a complicated case in its pleadings because both sides have made arguments in the alternative. It is the function of a district court to look at the evidence before it, deciding the merits of the assertions in the complaint and the defenses. Based on that evidence, I believe that there is at least a dispute of facts as to whether a legal "harm" occurred to Joyce before 1981. In my view, the record suggests that no such damage did take place. At a minimum, the granting of summary judgment and dismissal was error. This case should be remanded for further consideration on the merits.
 
 
 64
 For this reason, I must dissent.
 
 II
 
 65
 The district court committed reversible error in dismissing Count VI as it applied to corporate concealment after allowing only sharply limited discovery. On this basis as well the case should be remanded for a full trial on the merits.
 
 
 66
 By order dated August 15, 1983, the district court granted DuPont's motion to dismiss Joyce's complaint, except as to Count VI of the amended complaint. Paragraphs 53 and 54 of Count VI state:
 
 
 67
 53. In the alternative, if by careful review, it is determined under the appropriate Virginia statute of limitations that the Plaintiff should have determined that his injury existed prior to January 13, 1981, then it is only as a result of the fraud and conspiracy between defendant DuPont and its officers and employees that such knowledge was not imparted to Plaintiff before January 13, 1981.
 
 
 68
 54. If as a result of the fraud and concealment by DuPont and its agents to inform Plaintiff of his medical condition, he has lost his right to an action against the defendant miners and manufacturers, then DuPont by depriving Plaintiff of such cause of action has willfully and intentionally injured Plaintiff to the extent of damages that said miners and manufacturers would have been liable to Plaintiff.
 
 
 69
 The district court granted the plaintiff the opportunity to engage in discovery with DuPont limited to the issue of whether DuPont concealed from Joyce his medical condition with regard to asbestosis and other related diseases. The court ruled as follows:
 
 
 70
 1. On Defendant duPont's Motion to Dismiss, the Court granted the motion except as to Count VI of the Amended Complaint. With regards to that Count, the Court granted the Plaintiff opportunity to engage in discovery with duPont limited to the issue of whether duPont concealed from the Plaintiff Joyce his medical condition with regard to asbestosis and other related diseases.
 
 
 71
 Jt.App.Supp. 156. The court divided Count VI into two parts: (1) as the count applied to corporate actions where Joyce was not known personally to the corporate actors, and (2) where the allegations were narrowed to actions of specific persons who knew their acts affected Joyce. The court stopped all discovery scheduled by Joyce with respect to the corporate actions and limited discovery on fraud and concealment to the actions of those who specifically knew Joyce.
 
 
 72
 The discovery prohibited by the district court was designed to aid plaintiff to show that a loss of a right to sue because of a time bar was a fraud and concealment by DuPont and its agents. The concealment alleged by Joyce was corporate, part of a company-wide policy, dating back to at least 1964, to fail to test employees for asbestos, to fail to change working conditions, and to fail to tell employees suffering injury because of their illnesses. Toward that end, plaintiffs noticed depositions of various medical and corporate personnel in the "control group" of the company, in addition to depositions which were intended to establish the authenticity of documents reflecting corporate policy.
 
 
 73
 Plaintiff's theory concerning concealment was that individual plant physicians and lower level safety employees had information withheld from them by the "control group" directing company-wide policy on asbestos, so as to make it impossible for the physicians to properly diagnose asbestos-related diseases in their employees. Under this theory, it is the corporation itself which had the intent to conceal from a group of employees, of which Joyce was a member, the risk of harm from asbestos and resulting injury. The thrust of plaintiff's theory was not directed primarily at those DuPont employees who had specific personal knowledge of Joyce's condition.
 
 
 74
 Following the limited discovery allowed by the court, Joyce served notices on thirteen present and former DuPont employees. Plaintiff sought those depositions to prove corporate concealment.[4] On November 18, 1983 DuPont filed a motion for a protective order asking that the depositions not be taken or that the witnesses not be required to produce certain documents. DuPont argued that the individuals sought to be deposed could have no knowledge whether duPont concealed from these plaintiffs their medical conditions with regard to asbestosis. After receiving an opposition to that motion on November 28, 1983, a conference was held by the district court (no transcript is available of that conference). Plaintiff's counsel alleges that at the hearing, the district judge indicated that he intended his order dated August 15 to mean that Joyce must show not only corporate suppression of pertinent medical facts regarding its asbestos-exposed employees' medical conditions, but must also present proof that DuPont specifically intended to single out Joyce and thereby deprive him of the opportunity to pursue his legal rights under Virginia law. According to plaintiff's counsel, when he informed the court that his evidence established only that Joyce was a person known to be in the group subject to such conduct, the district judge instructed counsel not to proceed with the depositions. Jt.App.Supp. 201.
 
 
 75
 The district court ordered, effective January 19, 1984, the granting of defendants' motion for protective order. The court also decided to treat the motion as a motion for summary judgment, stating that it appeared to the court that there was no genuine issue of material fact in the action. Jt.App.Supp. 221-22. The district court then entered summary judgment for DuPont and dismissed the actions against it. The claim of the Estate of Bessie Lepus was not dismissed at that time, but was subsequently settled.
 
 
 76
 In my view, the district court erred in dismissing Count VI as it applied to corporate concealment after allowing only sharply limited discovery. By narrowly limiting the plaintiff to a showing of individual concealment by lower level employees, e.g., the plant medical director, the court made it impossible for the plaintiff to prove facts substantiating his theory of concealment by the control group of the corporation itself. Because of the district court's rulings, the plaintiff was prohibited from presenting facts to defeat summary judgment.
 
 
 77
 For this reason as well, the case should be remanded for full trial on the merits.
 
 
 
 [1]
 Joyce named as defendants A.C. and S., Inc., Eagle-Picher Industries, Owens-Corning Fiberglas Corp., Pittsburgh Corning Corp., Armstrong World Industries, Inc., The Celotex Corp., Fiberboard Corp., Armstrong Cork Co., Atlas Turner, Ltd., Bell Asbestos Mines, Ltd., E.I. DuPont de Nemours & Co., Inc., Gale Corp., Keene Corp., Lake Asbestos of Quebec, Ltd., GAF Corp., Southern Textile Corp., Raymark Industries, Inc., Nicolet, Inc., and Forty-Eight Insulation, Inc., each of which had its citizenship in states other than Virginia
 
 
 [2]
 In an order dated August 15, 1983, the district court granted the motions of William S. Legus, Sr., James S. Moore, both DuPont employees, and William S. Legus, Sr., Executor of the Estate of Bessie C. Legus, to intervene in this action. All of the claims of the Estate of Bessie C. Legus, as well as the claims of Moore and Legus against the manufacturers, were later settled. With respect to their claims against DuPont, references in this opinion to Joyce refer to the plaintiffs Moore and Legus as well
 
 
 [3]
 According to the deposition of DuPont's medical director, prior to 1970 the company's policy was to retain only an employee's initial X-ray and the most recent one taken, so long as intervening X-rays were free of changes. Consequently, the company retained only Joyce's initial 1946 chest X-ray until 1970, after which time it saved X-rays taken each year
 
 
 [4]
 Joyce also claims to be in the high risk category for mesothelioma, lung and intestinal cancer, and other asbestos-related diseases
 
 
 [5]
 The Virginia statute of limitations was amended in 1985 to provide that actions for asbestos-related injuries or diseases accrue "when a diagnosis of asbestosis, interstitial fibrosis, mesothelioma or other disabling asbestos-related injury or disease is first communicated to the person or his agent by a physician." Va.Code Sec. 8.01-249 (Supp.1985)
 
 
 [6]
 A well-established exception to the rule permits plaintiffs separate rights of action for personal injuries and property damage. See Caudill v. Wise Rambler, Inc., 210 Va. 11, 168 S.E.2d 257 (1969), Carter v. Hinkle, 189 Va. 1, 52 S.E.2d 135 (1949)
 
 
 [7]
 Plaintiffs' "Memorandum in Opposition of Celotex' Motion for Summary Judgment," at 3, n. 3
 
 
 [8]
 Virginia's two-year statute of limitations would appear, of course, potentially to foreclose Joyce's claims against DuPont just as it bars his claims against the manufacturers. DuPont did not plead a statute of limitations defense, however, and the district court disposed of the claims on other grounds. We address the issue accordingly
 
 
 [9]
 Section 65.1-7 defines "injury" and "personal injury" to include "only injury by accident, or occupational disease as hereinafter defined, arising out of and in the course of the employment...."
 
 
 [10]
 For a detailed discussion of the intentional tort exception, see Larson's Workmen's Compensation Law, Sec. 68 (1983). Other theories for the exception include a notion that the employer severs the employment relationship by his intentional wrong or that the wrong does not arise out of or in the course of employment. Id. at Sec. 68.11
 
 
 [11]
 That court has determined that injuries resulting from the intentional acts of third persons or fellow employees may be considered "accidental" within the meaning of the Act, provided they arise in the course of employment. See Continental Life Insurance Co. v. Gough, 161 Va. 755, 172 S.E. 264 (1934)
 
 
 [12]
 Section 65.1-46 of the Act defines "occupational disease" as follows:
 As used in this Act, unless the context clearly indicates otherwise, the term "occupational disease" means a disease arising out of and in the course of the employment. No ordinary disease of life to which the general public is exposed outside of the employment shall be compensable, except:
 (1) When it follows as an incident of occupational disease as defined in this title; or
 (2) When it is an infectious or contagious disease contracted in the course of employment in a hospital or sanitarium or public health laboratory.
 A disease shall be deemed to arise out of the employment only if there is apparent to the rational mind, upon consideration of all the circumstances:
 (1) A direct causal connection between the conditions under which work is performed and the occupational disease,
 (2) It can be seen to have followed as a natural incident of the work as a result of the exposure occasioned by the nature of the employment,
 (3) It can be fairly traced to the employment as the proximate cause,
 (4) It does not come from a hazard to which workmen would have been equally exposed outside of the employment,
 (5) It is incidental to the character of the business and not independent of the relation of employer and employee, and
 (6) It must appear to have had its origin in a risk connected with the employment and to have flowed from that source as a natural consequence, though it need not have been foreseen or expected before its contraction.
 
 
 [13]
 See Ind.Code Ann. (BURNS 1974 & Supp.1985) Secs. 22-3-2-1 et seq
 
 
 [14]
 DuPont contends that Joyce's claim for fraudulent concealment is remediable under the Virginia Workers' Compensation Act and therefore should have been dismissed pursuant to the Act's exclusivity provision. Although there is no Virginia authority on this point, a number of other jurisdictions allow separate actions for fraud where it produces a second injury or loss, such as the loss of a property right--Joyce's cause of action against the manufacturers--claimed here. See Larson's Workmen's Compensation Law, Sec. 68.32(a)-(c) (1983). We need not reach this issue, however, in light of the district court's disposition of Joyce's claim on summary judgment. To the extent that the district court may have erred by reaching the merits of this claim, that error was harmless
 
 
 [15]
 The district court treated DuPont's motion for a protective order as a motion for summary judgment pursuant to Fed.R.Civ.P. 56
 
 
 [16]
 DuPont sought and the district court granted a protective order pursuant to Fed.R.Civ.P. 26(c), after Joyce sought to depose a number of present and former DuPont employees without any showing that those individuals could have knowledge bearing on the alleged fraudulent concealment of Joyce's medical condition. In his memorandum in opposition to DuPont's motion for a protective order, Joyce argued that the proposed depositions would prove that DuPont knew as early as 1964 of the risks incident to asbestos exposure. Evidence that DuPont employees were aware of such hazards, however, although possibly relevant to Joyce's claim of intentional failure to warn of and alleviate the risk, would not be probative of the company's alleged fraudulent concealment of Joyce's condition
 
 
 [17]
 In his deposition testimony, Dr. Layton attributed his enlightenment with respect to the possible connection between pleural thickening and asbestos to a lecture that he attended in 1980
 
 
 [1]
 Dr. Westerfield stated that Joyce had no impairment or functional impairment from pleural thickening, Jt.App. 198; Dr. O'Neill stated that Joyce had no loss of function from the pleural changes, Jt.App. 108; Dr. Berkowitz indicated that it is only when it is severe that pleural thickening causes disease and impairment, Jt.App. 195, 196; Dr. Rivers concurred that such changes do not as a rule result in impairment, Dep. of Apr. 12, 1984, p. 15; Dr. Layton testified that he had believed until 1981 that unilateral pleural thickening is not caused by asbestos exposure, Jt.App. 83, Layton Dep. 82
 
 
 [2]
 They did not know the medical guidelines of the company existing during this period of time, Jt.App. 78; they did not know if the films were copies or originals, Jt.App. 113; they did not know of any policy changes in retaining or interpreting the x-rays, Jt.App. 76; and they did not have any personal knowledge of what the notations on the films revealed, Jt.App. 70. Dr. Layton could only "assume" that whoever wrote "soft lesion, right lung, unchanged over last several years" on the x-ray dated 1972 was looking back retrospectively over previous years, Jt.App. 72
 
 
 [3]
 For instance, Dr. Layton, looking at the 1972 film, said it was "hard to tell if it was in focus," and that after looking at the x-ray said "you can't tell if there is a lesion on the pleura." But he assured the questioner that, "It's there. It just doesn't show up," and that he could "recall" it. Jt.App. 71-73. When Dr. O'Neill was asked whether the pleural thickening that he saw appeared on all the x-rays, he said he could not recall; he stated that he could not relate as to what time frame the x-rays covered. Jt.App. 103-04
 Dr. O'Neill was "quite sure" there had been pleural thickening before 1981, but he was only able to conjecture that the x-rays dating back several years "may be able to tell you with certainty that it's been ... however long it's been there on an x-ray it's been there at least that long." Jt.App. 106. As to the 1980 x-ray, the one most probative, if any, of the series Dr. O'Neill could only speculate that someone had drawn a circle on the film and that there was "probably" some pleural thickening. Jt.App. 114.
 
 
 [4]
 Several of those served were allegedly members of a special DuPont Asbestos Issues Coordinating Committee; others had allegedly been mentioned in various documents beginning in the 1960's with regard to asbestos hazards. Dr. Stopps allegedly wrote an early memorandum to Dr. D'Alonzo recommending asbestosis screening. Joyce's notices requested those deposed to furnish materials relating to meetings with plant medical personnel, minutes of the "Asbestos Issues Coordinating Committee" meetings, or materials with regard to company-wide policy or practice relating to asbestos exposure